O. B. McClure, Respondent, v. G. A. Wilson, Appellant.—185 S. W. (2d) 878.

Springfield Court of Appeals.   February 15, 1945.

*M. W. Henson* for appellant.

*Maness & Maness* for respondent.

826

VANDEVENTER, J.—The respondent here was the plaintiff below, the appellant was defendant, so, for convenience and clarity, we will refer to them in the roles they played in the trial court.

This is a suit for $1300, with interest, as the balance of the purchase price of some real estate known as the King Bee Ranch, containing 1600 acres and located in Ripley County, Missouri. Plaintiff in his petition alleges that prior to March 27, 1942, he was the owner of the above-mentioned real estate, describing it by metes and bounds, but that the paper title was in Vandy Byrd and Hilda Byrd, his wife, who were holding it for plaintiff. That he sold this land to the defendant for the agreed price of $4500 and on the same day conveyed the same to defendant by warranty deed signed, executed and acknowledged by the said Byrds. That $3200 of the purchase price had been paid but though numerous demands had been made, de-

fendant had failed to pay the remainder. Plaintiff further asserted that he had a vendor's lien upon said real estate for the unpaid balance, with interest, and prayed for judgment and that it be declared to be a lien on the land which he sold to satisfy the same.

Defendant's answer (first amended) admitted the sale pursuant to a written contract which was attached to and made a part of the answer as Exhibit "A". This contract was dated February 17, 1942, and stated plaintiff was to sell defendant the King Bee Ranch of 1600 acres for $4500, two hundred dollars of which was paid at the time, the balance to be paid within ninety days from date. Plaintiff in this contract agreed to furnish an abstract showing a merchantable title in himself with taxes for 1941 paid before the execution and delivery of the warranty deed to the premises. The plaintiff also agreed to bring the abstracts to date at his expense and to execute and deliver a warranty deed to defendant, the buyer, free of all encumbrances within ninety days.

Defendant's answer further stated that he paid $3200 on this agreement but that plaintiff failed to comply with his part of the agreement in that he did not warrant and defend the title as the title, at the date of the agreement, was vested in the Byrds. Defendant further stated that plaintiff failed to bring the abstracts to date free of expense to the defendant.

Defendant then alleged that he entered into another contract with plaintiff, and which he makes a part of his answer by attachment and reference as Exhibit "B". This contract seems to have been entered into on March 27, 1942, between the same parties some thirty-eight days after the first one, (Exhibit "A") was about the same land and this second contract asserted that plaintiff had that day given defendant a warranty deed to the real estate, known as the King Bee Ranch, signed by Vandy Byrd and his wife Hilda, the total consideration being $4500 of which $3200 had at that time been paid. That certain requirements had been made in an opinion by defendant's attorneys relative to the title, said opinion having been written March 24, 1942. The contract then recited:

"Whereas first party has today delivered to second party a warranty deed to 1,600 acres of land in Ripley County, Missouri, known as the King Bee Ranch, and whereas the total consideration for said sale is $4500; $3200 of which has already been paid to first party leaving a balance of $1300; and whereas the said deed was signed by Vandy Byrd and Hilda Byrd, his wife, and whereas certain requirements concerning the title have been made by second party's attorneys, Maness & Maness, their opinion being dated March 24, 1942;

"Now, Therefore, it is understood and agreed between the parties hereto that the said $1300 is to be retained by second party until the said requirements of his attorneys have been complied with, and after that has happened, is to be paid to first party, with the following

exceptions: Second party is to bear the expense of his attorney's fee for the examination of title, also attorney's fee and court cost for obtaining a court decree quieting title in himself, and first party is to bear the expense of certifying the abstracts to date after the said decree is issued, if any.

"It is further agreed that first party is to pay for any other curative material requested in the said opinion.

"It is the intention of this agreement between both parties that second party shall have good merchantable title to the above-mentioned land and the said $1300 is to be retained by him until merchantable title is vested in him."

Defendant then asserted that the $1300 balance of the purchase price was not due at the time of the filing of the petition because plaintiff had not complied with the requirements of his attorney's opinion in that he had not at the time of the filing of the suit (1) procured a release of a certain deed of trust recorded in Book 115, page 117 in the Recorder's office in Ripley County and (2) had failed to procure nine specified patents or certified copies thereof to portions of the purchased land and that they were necessary to perfect a merchantable title. It was further asserted that other "curative material" was required in the attorney's opinion but that the opinion had been mislaid and they could not be specifically set forth. That plaintiff prior to filing the suit had not offered to pay for the procuring of any of the curative material and that by reason of the foregoing, the defendant had been damaged in the sum of $1500 on which damage he prayed the court to apply the unpaid $1300 and render him a judgment for the remaining $200.

To this somewhat lengthy answer, plaintiff replied (after an ineffectual attempt to strike out much of it) admitting the execution of the two contracts (Exhibits A and B) and that the release of the deed of trust and procurement of the nine patents, or photostatic copies thereof, had not been procured at the time of the filing of the suit, denied that he ever represented that the "paper title" to the land was in him, denied that he had ever failed or refused to comply with any of the provisions of the two contracts, denied that there was other curative matter required, or that defendant had suffered any damage.

Plaintiff, in his reply, further alleged that subsequent to the execution of contract "A", he caused the abstracts of title to be brought down to date and delivered to defendant's attorneys, who examined them and wrote an opinion which showed the "paper title" to be vested in the Byrds and that defendant later agreed to accept a deed from the Byrds instead of from plaintiff and his wife; that pursuant to said agreement, defendant did accept such deed, entered into contract "B" and paid plaintiff $3000 more on the purchase price. The parties then agreed at the time of the execution of contract "B" and also subsequent to the execution and delivery of the same, that de-

fendant would retain the $1300 until all of the requirements set out in the attorneys' opinion had been complied with and that subsequent to the execution of contract "B", defendant agreed to procure the curative material referred to the contract "B", including the filing of a suit to procure a decree quieting the title to said land, if necessary, and was to pay for all said curative material except the quiet title suit out of the balance due on the purchase price and to bring said suit within a reasonable time.

Plaintiff in his reply, further stated that he and his attorneys on numerous occasions requested defendant to institute the quiet title suit and to procure such other curative material, if any, but that defendant failed and refused to do either but asserted in person, and by his agents, that he was well satisfied with the title and did not believe it necessary to procure any of the curative material, all of which refusals were made prior to the filing of this suit. That after the filing of this suit "even though it was not incumbent upon him to do so," plaintiff procured all of the said curative matter referred to in defendant's amended answer and delivered the same to defendant.

All other allegations of new matter in the answer were denied generally. Defendant then filed a motion to strike out a portion of plaintiff's reply which the court overruled. He then filed a motion for judgment on the pleadings, which was also overruled.

The evidence showed that the parties hereto in writing entered into contract "A" on February 17, 1942, at which time $200 was paid on the purchase price. Plaintiff had his abstracts brought to date and delivered to defendant's attorneys for examination. They made certain requirements, the ones material here being the release of a deed of trust and procuring copies of nine patents from the United States, all to be within ninety days from the date of the contract. On March 27, another written contract was entered into between the parties changing the provisions of the previous contract and defendant paid $3000 more on the purchase price of the land. In this last contract, defendant accepted a warranty deed from the Byrds instead of from plaintiff as provided in the former one. Defendant also agreed to bring a quiet title suit, if necesssary, to perfect his title, and at his own expense. The cost of curative material required, if any, as well as the recertification of the abstracts was to be paid for out of the $1300 remaining unpaid of the purchase price.

Between April 20th and 25th, 1942, defendant by telephone requested the abstractor to mail the abstracts to him, which was done and he retained them until about the time of the trial. The abstractor testified that the requirements of the attorneys' opinion were complied with as well as could be without the abstracts which defendant had. The requirements were all complied with before the trial, but after the commencement of the suit, and the quit-claim deed and the patents were receipted for by defendant's attorney, October 19, 1943.

A written demand was also made upon defendant's counsel for the abstracts on June 21, 1943. They were not furnished, probably because the attorney for defendant had asked for a copy of the opinion (the original of which had been given to his client, the defendant) and had not received it.

The plaintiff testified that he entered into both contracts with defendant, that plaintiff did not give defendant a warranty deed to the land because defendant agreed to take one from the Byrds, although plaintiff at the time had a deed properly executed by himself and wife ready for delivery. He also had an unrecorded deed from the Byrds properly acknowledged but with grantors and grantees names omitted. Plaintiff further testified that after the signing of contract "B" defendant agreed to procure the curative material himself. Plaintiff later made seven trips to see defendant about paying the balance on the purchase price. Plaintiff testified: "Mr. Wilson (the defendant) never did ask me to get him any curative material." Plaintiff further testified that he had never seen the abstracts since he "closed the deal" until the day of trial and that before the institution of the suit, he learned that defendant was insolvent and that he had mortgaged the property.

On cross-examination, plaintiff testified that he bought the land from J. R. Baker, paying $3800 in cash for it. The title was placed in Byrd and his wife and they in turn executed to him a warranty deed in blank. When plaintiff procured the deed from the Byrds to defendant, he "tore in two" the deed they had given to him but retained the pieces. Plaintiff's reason for taking the deed in blank was to keep people from knowing his business, to avoid taxes and for the further reason that he had been sued for $20,000 for failing to properly care for a corpse in his undertaking business. The evidence further showed that defendant was married and that his personal property, as shown by his assessment list was valued at $85. The records of an option dated October 1, 1942, and given by defendant to one Hyman and wife of Baltimore, Md., for purchase of the land, a deed of trust to secure a note for two thousand dollars to the Bank of Poplar Bluff, dated May 15, 1942 (afterwards released), and a warranty deed dated June 2, 1943, to King Bee Mining Co. of Baltimore, Md., given by defendant and wife were introduced in evidence.

The defendant testified that he became a resident of Ripley County in February, 1942, and began to negotiate for the King Bee Ranch. Maness and Maness were to complete the abstracts of title and were to do whatever work he needed. The first time they represented him was February 17, 1942, when the first contract was made. He assumed that they were still representing him when this suit was instituted. Defendant went to the Baker Land Company on March 22, 1942, obtained the abstracts and left them with Maness and Maness for completion and examination. He further testified that "the coun-

sel'' was to procure the quit-claim deed and nine photostatic copies of patents from the land office and pay for it out of the $1300; that he had never been presented with a bill for this material. Mr. Maness, plaintiff's counsel, had requested the abstracts and defendant had told him, ''It is in the hands of my counsel.'' That he had never refused to let anybody have the abstracts; that he did not tell ''them'' that he was to personally get the curative material, but he was relying on his attorneys to do that. That he was always ready and willing to pay the $1300 if a good merchantable title, approved by his attorneys, had been furnished him. That he put the money in the bank in the beginning of his negotiations and it was still there to pay the bills, and that plaintiff would have been paid if he had furnished him a merchantable title; that the provisions of the contract had not been complied with before the institution of this suit. He stated that his reason for not paying the $1300 was ''I wanted a court order on it as there has never been a time I wasn't ready to file suit to quiet title.'' He talked to Mrs. Maness over the telephone from Baltimore the latter part of April or first of May, 1942, as the abstracts had been left with Maness and Maness until that time, and she agreed to mail them to him, that day. That he had spent about $20,000 on saw mills and mines located on the property. After March 27, 1942, and before he sold the property to King Bee Mining Co., he testified, it had been appraised for $100,000 by engineers. On cross-examination, he stated that he assumed Maness & Maness were his attorneys at the time the contract with plaintiff was made and that he understood they were to bring suit to quiet title and were to obtain all of the curative material. He denied saying that he was satisfied with the title and stated that he believed that if this suit had not been brought, he could have sold the land for $16,000.

He later deeded the land to King Bee Mining Company for a consideration of $25,000 and until a short time before the trial was Vice President of that company. He was then asked, ''Do you know of anything in that contract that hasn't been complied with?'' Answer: I don't know. That is why I have counsel.'' He then stated in answer to the question: ''When are you going to file a quiet title suit?'' Answer: ''When you get your nose clean. I am ready to file suit this afternoon.''

After due consideration, the court rendered judgment for plaintiff for $1300 and costs, decreed that it be declared a lien upon the real estate and dismissed defendant's counterclaim. From this action of the court, this appeal was taken.

The main questions for determination are: 1. Was the suit prematurely instituted? 2. Did plaintiff come into court with clean hands?

If plaintiff's testimony was true, the last written contract was modified by parol. This could have been legally done. [Shaffner v. Moore

Shoe Co. (Mo. App.), 35 S. W. (2d) 935; Davis v. Scovern, 32 S. W. 986, 130 Mo. 303; Tighe v. Locke (Mo. App.), 299 S. W. 105.]

Defendant denied that he agreed to personally procure the curative material required. He stated that he didn't have the ability to do it, but "was relying on my attorneys to do that." He admitted that when the abstracts had been requested of him for the purpose of getting the release and patents, that he told Mr. Maness (plaintiff's counsel): "It is in the hands of my counsel." When they were later requested of defendant's counsel, he refused to comply.

Defendant cannot now complain of plaintiff's failure to timely procure the release and patents when his and his attorneys' acts delayed their procurement. [Wentzel v. Lake Lotawana Develop. Co., 48 S. W. (2d) 185, 226 Mo. App. 960; 17 Corpus Juris Secundum, page 966, section 468.]

Furthermore, the evidence at the trial showed, without controversy, that the deed of trust, complained of in defendant's answer, had previously been released. The nine patents had been procured and delivered to defendant's counsel.

Whether the last written contract was modified by parol, as testified to by plaintiff, whether defendant agreed to procure the curative material required by the attorneys' opinion and whether defendant obstructed or delayed the procuring of the release of the deed of trust and copies of the nine patents were all questions of fact for the trial court and he decided them against the defendant. He had the opportunity to hear and observe the witnesses at the trial and was in a better position than we to judge of their credibility. We see no reason to disturb his decision. [Creamer v. Bivert, 113 S. W. 1118, 214 Mo. 473; Carr v. Carroll (Mo.), 178 S. W. (2d) 435.] We hold that the suit was not prematurely brought. [Quigley v. Bartlett (Mo. App.), 260 S. W. 495.]

Neither can defendant complain that a quiet title suit had not been brought. This was a duty resting upon him as he had agreed to bring it, if necessary, when he executed the contract on March 27, 1942. It should have been done within a reasonable time. The case before us was filed for the June, 1943 Term of the Circuit Court of Ripley County. Three terms of that court had passed between the date of his contract to bring the suit and the June, 1943 Term of the Ripley County Circuit Court. Of this we take judicial notice. [Owl Drug Co. v. Frank Whalen Adv. Co. (Mo. App.), 156 S. W. (2d) 777.] Furthermore, he had not even brought it for the June Term.

It is vigorously contended that plaintiff does not come into court with clean hands because when he purchased the land in question, he took the title in the name of another with a deed in blank from that person which was not recorded, so plaintiff's name would not appear on the record, for the purpose of evading taxes, and to defraud creditors. We fail to see how he could defeat the claim of the State

or county for taxes as the land would be assessed in the name of the record owner and be a lien thereon. Neither does the record show that plaintiff has any judgment creditors. It does show a suit had been filed against him. Be that as it may, we believe that appellant misconceives the limits of the maxim of equity which requires one to come into court with clean hands. That maxim has its limitations. It does not operate so as to repel all sinners from a court of equity, nor does it apply to every unconscientious act of a party. It merely considers misconduct in relation to the subject-matter of the suit and to the defendant. It is as of the date of the filing of the petition that such parties' conduct is usually appraised. [Stegmann v. Weeks, 214 S. W. 134, 279 Mo. 131; Williams v. Beatty, 122 S. W. 323, 139 Mo. App. 167; Hingston v. Montgomery, 97 S. W. 202, 121 Mo. App. 451; 30 Corpus Juris Secundum, page 487, sec. 98; 19 American Jurisprudence, page 327, sec. 473.]

Plaintiff had purchased the King Bee Ranch about a year before the first contract with defendant, and about a year before defendant had any dealings with him. The purchase of the land from J. R. Baker by defendant was an entirely different transaction from his sale of it to the defendant a year later. His transactions at the time of purchase, however "unclean", were not connected with the subject of this action or with this defendant. Hence, the maxim does not apply.

The King Bee Mining Company is not a party to this suit and there is no evidence that it was an innocent purchaser. In fact the evidence rather indicates otherwise. Defendant was a vice president of the company. He was the vendor of the land to it. It was conveyed after this suit was filed. He testified that the consideration for the sale was $25,000, yet in another breath, in justifying his claim for damage, says: "I believe if this suit had not been brought, that I would have gotten $16,000 for this land." However, it is unnecessary for us to decide this question. Its rights, if any, cannot be adjudicated in this action.

The judgment of the trial court is affirmed. *Blair, P. J.,* and *Fulbright, J.,* concur.